1998-NMSC-049

970 P.2d 1143

Susana COBOS, Personal Representative of the Estate of Socorro Morales, Luis Daniel Morales, and Crystal Selene Morales, and individually, Plaintiff–Petitioner,

v.

DOÑA ANA COUNTY HOUSING AUTHORITY, Board of County Commissioners of Doña Ana County, Lucia Archuleta, Nancy Alvillar, and Apolonio Montejano, Defendants–Respondents.

No. 23,288.

Supreme Court of New Mexico.

Dec. 3, 1998.

Rehearing Denied Dec. 21, 1998.

Hubert & Hernandez, P.A., Lee E. Peters, Las Cruces, for Petitioner.

Modrall, Sperling, Roehl, Harris & Sisk, P.A., Mary T. Torres, Las Cruces, for Respondents.

William H. Carpenter, Michael B. Browde, Albuquerque, for Amicus Curiae, New Mexico Trial Lawyers Association.

Nancy Augustus, Albuquerque, for Amicus Curiae, New Mexico Defense Lawyers Association.

Paul M. Schneider, Santa Fe, for Amicus Curiae, Risk Management Division of New Mexico General Services Department.

## OPINION

McKINNON, J.

{1}   In this case we must decide whether a breach of public employees' duties of operation and maintenance of a privately-owned building used to provide shelter under a fed-erally-funded low-income housing program falls within the "building waiver" of the New Mexico Tort Claims Act.  *See* NMSA 1978, § 41–4–6 (1977) (waiver of governmental immunity for "operation or maintenance . . . of *any* building" (emphasis added)).  The trial court and the Court of Appeals held that the public entity must have a legal ownership interest in the real property for the waiver to apply.  We hold that the Legislature intended the building waiver to apply to *any* building in which public employees owe a duty to operate or maintain exercising ordinary care.  We conclude that public employees had such duties in this case under the controlling statute, regulations, and contracts.  However, we affirm the dismissal of Plaintiff's claims against the Dona Ana County Housing Authority and the Board of County Commissioners because of her failure to give these defendants timely notification of her claim.

### I. FACTUAL AND PROCEDURAL BACKGROUND

{2}   The Plaintiff Susana Cobos and her family were participants in a federally-subsidized low-income housing program administered by the Doña Ana County Housing Authority.  Their home was privately owned and rented to them through the Authority's Section 8 Existing Housing Program.  That program allows local governmental agencies to utilize private dwellings to meet a local need to shelter families of little means.  Under the program the Authority contracted with the owners of Plaintiff's home to pay rent on her behalf in return for a certain amount of control to assure that the home fulfilled the purposes of the state and federal public housing schemes in providing "decent, safe, and sanitary" housing to the area's poor.  *See* 42 U.S.C. § 1437 (1988).

{3}   An early-morning fire killed Plaintiff's daughter Socorro Morales and Morales' two young children on November 11, 1990, while they were sleeping in Plaintiff's home.  The fire apparently was caused over time by a defect in the fireplace flue, and started slowly in the roof beams adjacent to the room in which the victims were sleeping.  The home was not equipped with a smoke detector.

{4} Plaintiff brought a wrongful death[1] suit against Defendants claiming that they breached their duty to keep the home in "decent, safe and sanitary" condition, specifically alleging the Authority's employees negligently selected and inspected the building and failed to notice the absence of a smoke detector. The trial court dismissed these claims on the basis that the New Mexico Tort Claims Act immunized Defendants from suit. The Court of Appeals affirmed. *See Cobos v. Doña Ana County Housing Authority,* 121 N.M. 20, 22–23, 908 P.2d 250, 252–53 (Ct. App.1995). The Court of Appeals reasoned that the Act's "building waiver," Section 41–4–6, did not cover the regulation of privately-owned property, and that the Authority did not have a sufficient legal interest in the building to create a duty to operate or maintain. *Id.* We reject the Court of Appeals' analysis.

{5} Our rejection of this reasoning, however, does not change the outcome of this case with respect to the governmental defendants. The trial court found that the Board and the Authority "did not receive actual notice of contemplation of litigation" under the Tort Claims Act. *See* NMSA 1978 § 41–4–16(C) (1997) (requiring that a plaintiff timely notify the public agency of her claims). The Court of Appeals reviewed this finding, held that it was supported by substantial evidence, and affirmed. *See Cobos* 121 N.M. at 24, 908 P.2d at 254. We declined to grant certiorari on the question of notice, and issued an Order of Clarification stating our intent to limit our review only to the question of whether Section 41–4–6 applies exclusively to premises liability claims. Accordingly, the notice issue is not before this Court. We address the building waiver issue to correct the misapprehension of the law that was created by the Court of Appeals opinion, but expressly limit our analysis to the threshold question of whether Plaintiff has stated a claim under the building waiver based on the duties of the public employees who appear as individual defendants in this case. *Cf.* NMSA 1978, § 34–5–14(B)(1) (1972) (providing that Supreme Court may review by writ of certiorari a decision of the Court of Appeals that conflicts with a decision of the Supreme Court). We express no opinion about whether Plaintiff could prove breach of those duties or proximate cause.

## II. Discussion

### The New Mexico Tort Claims Act and Building Waiver

■ {6} The New Mexico Tort Claims Act, NMSA 1978, §§ 41–4–1 to 41–4–27 (1976, as amended through 1991) attempts to balance two important but conflicting public policies. After the judicial rejection of common law sovereign immunity in *Hicks v. State,* 88 N.M. 588, 544 P.2d 1153 (1975), the Legislature sought to limit governmental liability so that "government should not have the duty to do everything that might be done." NMSA 1978, § 41–4–2(A) (1976). On the other hand, the Legislature also desired to compensate those injured by the negligence of public employees and to impose duties of reasonable care. *See id.* ("The legislature recognizes the inherently unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity."); *Folz v. State,* 110 N.M. 457, 461–62 n. 3, 797 P.2d 246, 250–51 n. 3 (1990). The Legislature's solution was to grant governmental entities and employees a general immunity from tort liability, but to waive that immunity in certain defined circumstances. In each of these waivers the Legislature identified a specific existing duty on the part of public employees, NMSA 1978, §§ 41–4–5 to 41–4–11 (1989), which, if breached, could result in liability "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty." NMSA 1978, § 41–4–2(B) (1976); NMSA 1978, § 41–4–4 (1996).

■ {7} The "building waiver" waives governmental immunity for damages "caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or fur-

---

1. Plaintiff also alleged counts of breach of contract, negligent infliction of emotional distress, and violation of civil rights, but these claims are not the subject of this appeal.

nishings." NMSA 1978, § 41–4–6 (1977). Defendants argue that this waiver applies only to public property, and not to a privately-owned rental building. We disagree, because the effect of the waiver should not be determined by the legal status of or the title to the real property, but should instead be determined by an examination of the public employees' duties. We conclude in *Part I* that the Legislature intended the waiver to apply to *any* building that public employees have a duty to operate or maintain. In *Part II* we examine the statutory, regulatory and contractual duties placed on Authority employees which required the exercise of ordinary care in the operation and maintenance of Plaintiff's home. In *Part III*, we conclude the policies underlying the building waiver are consistent with and foster the objectives under the Municipal Housing Law to provide safe housing for low-income persons.

### Part I: Scope of Duties, Not Property Ownership, Defines Waiver

■ {8} Our Legislature has specifically tied Tort Claims Act waivers to the "scope of duties" of public employees, not to the ownership status of the real property involved. The Act waives immunity for damages "caused by the negligence of public employees while acting within the scope of their duties in the operation and maintenance of any building." *See* NMSA 1978, § 41–4–6 (1977). The Legislature defined "scope of duties" to mean "any duties that a public employee is requested, required, or authorized to perform ... *regardless of the time and place of performance.*" NMSA 1978 § 41–4–3(G) (emphasis added).[2] Accordingly, the "building waiver" in Section 41–4–6 on its face excepts immunity for the negligent operation or maintenance of *any* building by a public employee acting within the scope of duty. This contrasts with the language immediately following, which waives immunity for negligent operation or maintenance of any *"public* park." *Id.* (Emphasis added).

■ {9} It also contrasts with provisions from many other states that expressly limit their waivers to public buildings. *Compare* NMSA 1978, § 41–4–6 *with* Colo.Rev.Stat. § 24–10–106(1)(c) (1988) (immunity waived for injuries resulting from "dangerous condition of any *public* building" (emphasis added)) *and* Mich.Comp.Laws Ann. § 691.1406 (West 1987) (government liable for damage resulting from "dangerous or defective condition of a *public* building if the governmental agency had actual or constructive knowledge of the defect" (emphasis added)) *and* Mo. Ann.Stat. § 537.600 (Vernon 1988) (immunity waived for "[i]njuries caused by the condition of a *public entity's property* if the plaintiff establishes that the property was in dangerous condition" (emphasis added).). Thus, Section 41–4–6 manifests no intent to restrict the waiver to publicly-owned buildings. *Cf. Castillo v. County of Santa Fe,* 107 N.M. 204, 206, 755 P.2d 48, 50 (1988) ("By the legislature's inclusion of both buildings and parks within the waiver provision, we discern no intent to exclude from that waiver liability for injuries arising from ... property surrounding a public building."). Also, there is no language that restricts its application to premises liability claims. As we noted in *Bober v. New Mexico State Fair,* 111 N.M. 644, 653, 808 P.2d 614, 623 (1991): "While Section 41–4–6 may appropriately be termed a 'premises liability' statute, the liability envisioned by that section is not limited to claims caused by injuries occurring on or off certain 'premises,' as the words 'machinery' and 'equipment' reveal." *See also Williams v. Central Consol. Sch. Dist.,* 1998–NMCA–006, ¶ 14, 124 N.M. 488, 952 P.2d 978 (Nov. 12, 1997) (noting that following *Bober* "Section 41–4–6 now waives tort immunity for a wider variety of negligent acts."), *cert. denied,* 124 N.M. 311, 950 P.2d 284 (1997). We conclude that the Legislature did not intend to limit the building waiver to property in which the public entity has a real property interest or a landowner's duty.

{10} Rather, it is clear from our cases that an ownership interest in a building is

---

2. The Legislature amended the definitions section of the Tort Claims Act in 1991 (after the events underlying this case occurred) to provide a negative definition of "maintenance": mainte-nance shall *not* include "an activity or event relating to a public building *or* public housing project that was not foreseeable." NMSA 1978, § 41–4–3(E)(2) (1991) (emphasis added).

but one of several ways of proving that a duty to operate or maintain exists. *Compare Seal v. Carlsbad Indep. Sch. Dist.,* 116 N.M. 101, 104–05, 860 P.2d 743, 746–47 (1993) (describing duties of an owner/occupier and citing W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 61, at 425–26 (5th ed.1984)) *and Castillo,* 107 N.M. at 206–07, 755 P.2d at 50–51 (discussing common law duties imposed on an owner or occupier) *with Merrill v. Buck,* 58 Cal.2d 552, 25 Cal.Rptr. 456, 375 P.2d 304, 309–11 (Cal.1962) (en banc) (holding that real estate salespeople not in privity with building's owners had a duty to warn tenant of reasonably foreseeable, concealed danger in the premises where salespeople were aware of the danger and had "affirmatively undertaken to show the house to [the tenant] in the regular course of their business with the purpose of earning a commission if she decided to rent it"). As a question of duty, this case is in some ways much simpler than cases like *Bober* and *Castillo* because the harm to Plaintiff's family was undisputedly caused by a physical defect within the building, not something external to it. In *Castillo,* the county's ownership and operation of a low-income housing project provided the basis of the county's duty to maintain common areas between the buildings in a safe condition. 107 N.M. at 207, 755 P.2d at 51 ("As landlord, the defendant [county housing authority] was under a duty to maintain safely those areas expressly reserved for the use in common of the different tenants." (citation omitted)). Likewise, in *Bober v. New Mexico State Fair,* the State Fair's ownership and control of a concert hall imposed duties to prevent unsafe conditions on the property that led to injuries on property adjacent to the public property. 111 N.M. at 646, 653, 808 P.2d at 616, 623 (deciding "whether a landowner's duty to avoid creating or permitting an unsafe condition or activity on the premises is limited by the physical boundaries of the land"); *see also Schleft v. Board of Educ. of Los Alamos Public Schools,* 109 N.M. 271, 274, 784 P.2d 1014, 1017 (Ct.App.1989) (reasoning that the school board as landowner had a duty of care for unsafe condition on the land, including protecting against dangers presented by an electrical facility located inside an easement).

We have never held, as Defendants and their amici argue, that an ownership interest in the real property is a *prerequisite* for the building waiver to apply. To the contrary, we have expressed disagreement with a narrow and formalistic interpretation of Section 41–4–6. *See Bober,* 111 N.M. at 652–53, 808 P.2d at 622–23 ("We reject any narrower view of the applicability of [Section 41–4–6] that may be contained in any of the cited court of appeals opinions," including *Gallegos v. State,* 107 N.M. 349, 351, 758 P.2d 299, 301 (Ct.App.1987); *Martinez v. Kaune Corp.,* 106 N.M. 489, 491, 745 P.2d 714, 716 (Ct.App. 1987); *Pemberton v. Cordova,* 105 N.M. 476, 478, 734 P.2d 254, 256 (Ct.App.1987) and *Wittkowski v. State,* 103 N.M. 526, 710 P.2d 93 (Ct.App.1985)); *cf. Williams,* 1998–NMCA–006, ¶¶ 11–14, 124 N.M. 488, 952 P.2d 978 (acknowledging that Supreme Court in *Bober* expressly rejected restrictive interpretation in these cases, stating that, "We believe the time is ripe to correct any continuing misapprehension regarding the import of that case law.").

***Part II:*** DUTIES OF OPERATION AND MAINTENANCE IMPOSED BY STATUTE, REGULATION, AND CONTRACT.

{11} A duty that falls within the building waiver may arise from sources other than the ownership status of real property. As we noted in *Calkins v. Cox Estates,* "[t]he determination of duty in any given situation involves an analysis of the relationship of the parties, the plaintiff's injured interest and the Authority's conduct; it is essentially a policy decision based on these factors that the plaintiff's interests are entitled to protection." 110 N.M. 59, 63, 792 P.2d 36, 40 (1990); *see also Merrill,* 25 Cal.Rptr. 456, 375 P.2d at 310 (noting that "a duty to exercise ordinary care not to injure another ... may arise out of a voluntarily assumed relationship if public policy dictates the existence of such a duty").

{12} Our appellate courts regularly look to statutes, regulations, and contracts as sources of duties of ordinary care imposed on public employees that may bring them within a Tort Claims Act waiver. For example, in *Torres v. State,* 119 N.M. 609,

612–13, 894 P.2d 386, 389–390 (1995) and *Schear v. Board of County Commissioners,* 101 N.M. 671, 672–73, 687 P.2d 728, 729–30 (1984), we held that a statute imposing the duty on law enforcement officers to investigate crimes meant that breach of that duty fell within the Tort Claims Act waiver covering law enforcement officers acting within the scope of their duties. Likewise, in *Miller v. New Mexico Department of Transportation* we held that a statute imposing the duty on an agency to regulate oversized vehicles traveling on state highways fell within the waiver in Section 41–4–11(A) of the Tort Claims Act that applied to the maintenance of highways. 106 N.M. 253, 255, 741 P.2d 1374, 1376 (1987) (statutorily superseded by the 1991 amendment to Section 41–4–3(E)(1), defining "maintenance"). But, in *Armijo v. Dept. of Health and Environment* where no claim was recognized, the Court of Appeals looked to the extensive regulations delimiting the duties of the agency, and held that they did not impose duties that would be covered by the relevant Tort Claims Act waiver. 108 N.M. 616, 618, 775 P.2d 1333, 1335 (Ct.App. 1989) (finding regulations did not impose the duties of clinical decision-making, which formed the basis of plaintiffs' complaint, and did not impose duties covered by the Tort Claims Act waiver for "operation of any . . . mental institution"); *see also M.D.R. v. State ex rel. Human Services Dept.,* 114 N.M. 187, 191–92, 836 P.2d 106, 110–11 (Ct.App.1992) (Minzner, J., specially concurring) (examining the regulations outlining the obligations of the agency in charge of foster care, and indicating that, if the plaintiffs had relied on those regulatory duties, they might have shown that the agency was in some respects "driving the bus," (alluding to *Chee Owens v., Leavitts Freight Serv. Inc.,* 106 N.M. 512, 745 P.2d 1165 (Ct.App.1987), where responsibility for "driving the bus" would fall within waiver)). In *Bober,* we indicated that duties imposed or retained in a contract with a private party can fall within the Tort Claims Act building waiver. 111 N.M. at 651–52, 808 P.2d at 621–22 (indicating duty might arise because the lease retained the right to enter and another agreement allowed the agency to employ necessary security).

{13} In this case, statute, regulations, and a triangle of contracts imposed specific duties to operate and maintain Plaintiff's home with due care. Plaintiff's home was being used by the Authority as part of a housing project under the state Municipal Housing Law, NMSA 1978, §§ 3–45–1 to 3–45–25 (1965, as amended through 1989), which required the Authority to operate and maintain the project with ordinary care. This law authorizes cities and counties to "construct, maintain, operate and manage *any housing project.*" NMSA 1978, § 3–45–5(A) (1989) (emphasis added); *see also* NMSA 1978, § 3–45–3(A) (1965) ("city" as used in law includes counties). It defines "housing project" as *"any work or undertaking"* of the county "to provide decent, safe, and sanitary dwellings . . . for persons of low income." NMSA 1978, § 3–45–3(J) and (J)(2) (1965) (emphasis added). Further, the Legislature granted local housing agencies the power to "arrange or contract for the furnishing *by any person* or agency, *public or private,* of services, privileges, works or *facilities for* . . . a housing project." NMSA 1978, § 3–45–4(F) (1969) (emphasis added). Thus, the Legislature created the local housing authorities for the purpose of operating and maintaining housing projects to meet the need for "decent, safe and sanitary dwellings" and contemplated the use of privately-owned facilities to do so when needed.

{14} The Municipal Housing Law also requires compliance with federal regulations affecting housing authority employees. *See* NMSA 1978, § 3–45–4(F) (1969) (requiring the local agencies to "comply with any conditions the federal government may have attached to its financial aid of the project"). The Doña Ana County Housing Authority chose to administer its housing program under a component of the federal Section 8 Existing Housing Program, which allows the Authority to use privately-owned homes, instead of publicly-owned or -built housing, for its participants. The program creates a relationship among the Authority, the private landowners, and the family in need. As the parties agree, the Authority screens for and certifies a qualified needy participant, and represents that it will subsidize the participant's rental of approved homes to an extent

424

that is prorated by income, need, and family size. The Authority then contracts with the owner of the property to provide rental housing for the participant. The contract provides that the Authority exerts a certain amount of control over the premises. The home must pass an occupancy test based on Housing and Urban Development (HUD) regulations, which are the minimum health and safety requirements for the housing to be considered "decent, safe, and sanitary." To ensure that these requirements are met, the regulations require the Authority to inspect the house prior to occupancy and annually after the lease is executed.[3] The owner-landlord is required to maintain and operate the home to ensure that it is "decent, safe, and sanitary housing," and the Authority may inspect the home at any time to ensure that minimal HUD requirements are met. If the owner fails to meet this obligation, the Authority "shall have the right ... to terminate or reduce housing assistance payments to the Owner, and to terminate the Contract." The Authority also retains the right to access the premises "to the extent necessary to determine compliance with this Contract." *Cf. Bober*, 111 N.M. at 651–52, 808 P.2d at 621–22 (the agency might have a limited contractual duty to operate or maintain in part because the lessor retained the right to enter); *Mitchell v. C & H Transportation Co., Inc.*, 90 N.M. 471, 472, 474, 565 P.2d 342, 343, 345 (1977) (an owner who retains the fight in a lease to enter and make repairs may be exposed to liability despite lease provision placing duty to maintain and repair on lessee). In the event of breach, the Authority's contract remedies include the right to terminate payments or to require the owner to take corrective action within a prescribed period of time. In return for this control, the Authority promises to pay the home's rental directly to the owner on behalf of the program participants. The regulations also require that the participants be placed in a home large enough to accommodate the household.[4] Under the state law and the federal regulations, the Authority exercised at least some control over the quality of the private housing by inspecting and selecting the proper dwelling and by providing in its contract with the owners a large degree of control over the building.

{15} Defendants characterize their relationship with the rented home as one of mere regulation and inspection of private property. They rely on *Martinez v. Kaune*, 106 N.M. at 490, 745 P.2d at 715 (no liability for negligent cheese inspection) and *Pemberton v. Cordova*, 105 N.M. at 477, 734 P.2d at 255 (no liability for negligent supervision of students) to argue that Defendants are therefore immune from liability. We disagree. The Legislature created the Authority for the purposes of operating and maintaining housing projects in a decent, safe and sanitary condition. The Housing Authority in Doña Ana County chose to do so by using private property in the manner prescribed by the federal regulations. Thus, the privately-owned home was substituted for publicly-owned low-income housing like that in *Castillo*, and Defendants' duties under the Municipal Housing Law and Existing Housing Program went far beyond a mere duty to inspect and regulate private conduct.

{16} We emphasize that Defendants' duties in this case do not arise as a consequence of the general regulatory relationship between the government and its citizens. Rather, Plaintiff has shown that Defendants engaged in a voluntary undertaking to effectuate the policies in Section 3–45–2 by providing Plaintiff's family with safe housing they could not otherwise obtain. This undertaking gives rise to a more specific relation-

---

3. The HUD inspection guidelines in effect at the time of the November 11, 1990, fire did not specifically require smoke detectors in program homes. However, a county ordinance requiring smoke detectors in existing one- and two-family dwellings, including Plaintiff's home, went into effect in April of 1989 (after the initial inspection but before the first annual inspection). *See* Doña Ana County Ordinance No. 61–89. The Authority inspectors were unaware of the county ordinance and, apparently because HUD guidelines did not require it, failed to look for a smoke detector in their first annual inspection. The home was due for its second annual inspection at the time of the fire.

4. Plaintiff's original program home failed to meed HUD requirements in an inspection and her family was relocated to the home in question just over two years before the fire.

ship among the parties than does general regulation for the public good. If Plaintiff were able to show that the Authority employees performed their maintenance duties in an unreasonable manner and that breach proximately caused this tragedy, nothing in Section 41-4-6 of the Tort Claims Act would prevent her from recovering damages from Defendants.[5]

{17} Defendants also erroneously characterize the negligence claim as the failure of Defendants to enforce a county smoke detector ordinance, noting that if injured parties were allowed to sue public agencies for failing to prevent private violations of local ordinances, the effect would be that local agencies would have the duty to do "everything that might be done," contrary to the intent of the Tort Claims Act. Thus Defendants claim that under these circumstances the government would have a heavy disincentive to regulate private conduct for the public good. However, this claim ignores the fact that Plaintiff's complaint is based on a broader allegation that Defendants failed in their duty to provide decent, safe, and sanitary housing. Cf. Castillo, 107 N.M. at 205, 755 P.2d at 49 (rejecting characterization of claim as failure to enforce animal control ordinance and analyzing as claim that public employees negligently operated and maintained premises). Thus, for the purpose of a motion to dismiss, the record supports Plaintiff's allegations that the failure to require a smoke detector could be found to be negligent, without regard to the existence of the ordinance. The Authority's director stated that he did not feel Plaintiff's home was safe without a smoke detector, despite his ignorance of the ordinance. Therefore, Plaintiff's claims do not necessarily rely on the lack of enforcement of the ordinance.

{18} We conclude that the relationships of the actors discussed above imposed at least limited duties of operation or maintenance on Authority employees. Under the Municipal Housing Law, the Authority's mandate was to "maintain, operate and manage any housing project." It chose to pursue

this mandate through a federal regulatory scheme that allowed it to arrange for privately-owned housing, instead of publicly-owned housing, and Plaintiff's family qualified for assistance from the Authority precisely because it was unable to secure "safe and sanitary" housing. Under these circumstances, we have no difficulty in determining that the Plaintiff stated a claim for relief because Defendants allegedly failed to exercise ordinary care in the maintenance and operation of the home.

***Part III:*** DUTIES UNDER MUNICIPAL HOUSING LAW CONSISTENT WITH POLICIES OF TORT CLAIMS ACT.

{19} As the Court of Appeals correctly noted, it is not enough for the public employees to have a duty—that duty must fit within the legislative intent of the Tort Claims Act waiver in order to state a meritorious claim for relief. Cobos, 121 N.M. at 24, 908 P.2d at 254; see also Saiz v. Belen Sch. Dist., 113 N.M. 387, 399-400, 402, 827 P.2d 102, 114-15, 117 (1992) (school district's nondelegable duty to take reasonable precautions against inherent dangers in specially dangerous work done by an independent contractor gives rise to strict liability, which is not actionable under the Tort Claims Act). In other words, the purpose of the agency's duty must be consistent with the purpose of the waiver in Section 41-4-6. One of the purposes of the Municipal Housing Law is to impose on the Authority duties of operating and maintaining safe housing for those otherwise unable to secure it. See NMSA 1978, § 3-45-2(E) (1965) (the Legislature enacted the Municipal Housing Law for the express purpose of "providing safe and sanitary dwelling accommodations for persons of low means"); 42 U.S.C. § 1437 (1988) (the express purpose of the federal program is to "assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income," and federal policy is "to vest in local public housing agencies the maximum amount of responsibility in

---

5. We clarify that nothing in this opinion should be read to hold Defendants strictly liable for defects in program homes, or to imply that the

owners of such homes in any way escape liability for their own negligence by virtue of their contract with the governmental agency.

426

the administration of their housing programs"). Similarly, the Legislature intended the building waiver to ensure that public employees fulfill their duties of operation or maintenance in such a way as to keep public housing projects reasonably safe for participants. *See Castillo,* 107 N.M. at 207, 755 P.2d at 51 (the duty of county to keep premises safe from reasonably known dangerous conditions matched precisely with the Legislative intent of Section 41–4–6 to ensure that public employees fulfill their duties to operate and maintain in such a way to keep buildings safe for public use); *see also* NMSA 1978, § 41–4–3(E)(2) (1991). The fact that Doña Ana County chose to use privately-owned buildings instead of constructing or acquiring its own to deliver services to the poor of Doña Ana County does not alter the duties imposed on Defendants by law. *See LaBalbo v. Hymes,* 115 N.M. 314, 320–21, 850 P.2d 1017, 1023–24 (Ct.App.1993) (concluding that the legislature intended that there be no material distinction between clients receiving habilitation services at private facilities and those receiving them at state-owned facilities). The duties to operate and maintain imposed by the Municipal Housing Act are precisely the same as the Legislature's objective in the building waiver—to help ensure that Authority employees administer housing projects with ordinary care. *See also Saiz,* 113 N.M. at 398, 827 P.2d at 114 ("[I]t should be remembered that the policy behind the law of torts does more than compensate victims—it encourages reasonable safeguards against the risk of harm."). Defendants' duties affecting Plaintiff's home were precisely the type of activity for which immunity was waived by the Legislature. *Compare Castillo* 107 N.M. at 206 n. 1, 755 P.2d at 50 n. 1 (the Authority's obligation to maintain the common premises of a housing project consistent with the Section 41–4–6–waiver) *with Smith v. Village of Corrales,* 103 N.M. 734, 713 P.2d 4 (Ct.App.1985) (no connection between animal control officer's duties and goal of Section 41–4–11(A) to keep highways safe for the traveling public).[6]

***

6. We do *not* hold that any defendant is vicariously liable for the owner's negligence. It may be that the Authority employees conducted their duties with due care, yet the owner was negli-

## IV. Conclusion

{20}    We hold that Section 41–4–6 applies to "any building," public or private, that public employees have a duty to operate and maintain with ordinary care. The Authority employees had duties of operation and maintenance of this home as part of their control of a housing project. Therefore, we reverse and remand for further proceedings as to the individual defendants. We affirm the dismissal of Plaintiff's claims against the governmental defendants, however, because we declined to grant certiorari on the question of notice, and therefore the Court of Appeals decision on that question stands.

{21}    **IT IS SO ORDERED.**

FRANCHINI, C.J., BACA, MINZNER and SERNA, JJ., concur.

gent. Any defendant would only be liable comparatively to the extent that defendant breached a duty to the Plaintiff's family and thereby caused the victim's tragic death.